Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to give their attention where the Court is now sitting. God save the United States and this Honorable Court. Our first case today is number 19-2041, Benjamin v. Sparks. Mr. Pearson? Yes, good afternoon and may it please the Court. We respectfully ask on behalf of Appellant Saul Hillel Benjamin that the Court reverse the jury verdict due to multiple reversible errors and abuses of discretion, as well as reverse in part the grant of summary judgment on Title VII and Section 1981 and the motion to dismiss. There were four main reversible errors that would have altered the outcome of the trial, the first among them being improper instructions to the jury and verdict form on resignation. That's at 8630-31 of the appendix. Most starkly, the verdict form referred to both separations as resignations, even though there was undisputed evidence that Nicholas Sparks terminated Mr. Benjamin from the Nicholas Sparks Foundation. Mr. Sparks testified to this and a termination letter found at 8503 confirmed that Mr. Benjamin was fired from the Foundation on November 21, 2013 and there the District Court's instructions asked the jury whether plaintiff proved his resignation from the Foundation was involuntary. There was no evidence to support that question. There was no evidence that Mr. Benjamin asked for a characterization of resignation, which would not have changed the fact of his earlier termination. And why did that matter? Yes, Your Honor, the distinction between termination and resignation here is key. In fact, in the summary judgment order itself, the District Court acknowledged that there was an issue of fact as to termination versus resignation, voluntary or involuntary. The mechanics are different. The legal implications are different on whether or not an employee and the implications under the contract, most crucially, are different. If Mr. Benjamin was terminated, that was an involuntary separation. If we're going to entertain whether or not he was, whether his resignation was voluntary or not, that now introduces a whole other analysis under the Stone case and others, which was discussed at length, both on summary judgment and at trial. So to pose the Foundation separation as a resignation would confuse the jury and confuse the issues. In addition, proposing solely that the event of resignation with regard to epiphany further confuses the issues, since there was, again, much discussion at trial regarding whether or not this was a termination or resignation that was voluntary or involuntary in nature. So it very, very much confuses the issues and, in fact, contravenes the discussion on summary judgment. And that went all the way through this case through discovery. So the fact that the jury found that... Judge Singh, did you preserve all these issues that you're... properly preserve all the issues you're raising? Yes, Your Honor. And, in fact, the court noted itself that it considered all issues with respect to the instructions and verdict form to be preserved, because Judge Dever understood that this was not what the parties had proposed. And he made that statement very clear with respect to all parties. So the fact that the jury found that Mr. Benjamin's resignation from the Foundation was not voluntary not only is counterfactual, but it demonstrates that the jury was confused and or swayed by several other errors and abuses of discretion, including the admission of improper past acts and character evidence that bore no relevance or relation to defendants after acquired evidence defense, as well as the exclusion of crucial, unique deposition testimony from Dr. Jennifer Dueck regarding the November 21st termination meeting and statements by Mr. Sparks made to her regarding the nature of Mr. Benjamin's mental health and his forced ouster from the school. This first testimony was so important. Why were you late in making the disclosure on that? Absolutely, Your Honor. The reason that those designations were made when they were is that the instructions on the submissions, plaintiffs understood them to be identify your in-person witness bucket and your deposition witness bucket. Dr. Dueck was in the in-person witness bucket until she said that she would not testify in person and regrettably that that only happened on July 12th. Yes, there had been back. Yes, go ahead. Are you saying you identified her as an in-person witness on time? Absolutely, Your Honor. Yes, she was on our list and she was well known obviously to both the court and the defendants. She was the only person of five who is in that November 21 meeting who the jury did not hear from and this was exploited by defendants in their closing and I can talk about that in more detail. But what about the fact that dealing with designating her deposition and any objections there too would have delayed the trial since if I'm correct the designation of her as a deposition witness came pretty close to trial, didn't it? Well, Your Honor, the designations were made by plaintiffs 30 days in advance of trial. They're made on July 15th. The trial commenced August 15th. So not only did the parties have 30 days after those designations were first made but defendants had already made deposition designations. They had already gone through this deposition. The deposition was known to them and under and I'm sure the court is familiar with the southern states factors as well as cases like Dougherty. A situation like this where the material was already in defendant's possession and here not only was in their possession but they had already mined it for what they clearly thought was useful material. It was a single day deposition and the parties had ample time to deal with any counter designations or anything that like that that was counter designations had only passed two days before plaintiff made our own designations. Again, the reason that we had to change is that the witness's status changed. She made it clear that she simply was not going to testify in person at that time and plaintiff promptly made that position. She was his ex-wife, is that right? Well, she now is Mr. Benjamin's ex-wife. At the time of at the time of the incidents, she was still married to Mr. Benjamin, but yes. When she said she wouldn't testify, did she assert some privilege? She did not, no, your honor. She was Mr. Benjamin's ex-wife by that time, making her the only third party, the only third party non-party who was available to testify as those events, but she was not claiming privilege. She was fully deposed and that's where the designations are coming from, including with regard to what you said, she wouldn't testify at the trial. Then could you not issue subpoenas or something? Ah, yes, as far, pardon, sorry. As far as the reasons for that, your honor, Dr. Duke is located in Winnipeg, Manitoba. So, correct. All right, correct. And yes, so the parties knew about this witness and this witness was a crucial witness known to be so by the court and all the parties throughout. This was not a new witness being sprung on the defendants. This was not extremely voluminous testimony. This was not a new class of damages. The cases that the district court and defendants relied upon, essentially all of them did involve new witnesses, a new expert, a new expert report, new types of damages being sought and calculated, things of that nature. Dougherty, which I mentioned, is a case that makes it very clear that where a witness is of great concern, there is a need to disclose. And here plaintiff offers a good faith explanation for that disclosure. Unfortunately, the witness's status changed. In our submissions, we had noted that if a witness's status changed, we respectfully asked for the right to include deposition designations. And indeed, when defendants included their designations, our response to those was that our understanding is that Dr. Duke would be testifying in person and therefore the designations at that time were not necessary. And how long after her status changed did you notify opposing counsel in the court? Yes. So on July 12th, her status, she said that she was refusing to show up any longer. She wouldn't do it. And July 15th, we sent defendants. We were exchanging red lines with regard to pre-trial submissions and we included Dr. Duke's designations in that red line. Why didn't you tell him on the 12th? Your Honor, you know, hindsight is 20-20. We needed to make those designations. And so, you know, we thought that that was prompt. Under the court's order and under Federal Rule 26, Rule of Civil Procedure 26, designations are generally, under 26, their designations are generally due 30 days in advance of the trial, which we did meet. We thought that we were acting promptly and, you know, and within the spirit of the court's order because, again, the court had said you make designations of people who you expect to testify at deposition. So that's what was done. The surprise, we believe, was non-existent because, again, everyone knew that she was going to be a witness one way or another. The ability to cure the surprise under Southern States was there 30 days in advance. There was no disruption of the trial. Certainly, if the parties had agreed, okay, fine. This is now a deposition witness. And again, two days beyond the counter-designation date. The importance of the evidence was extremely high, which under Southern States can cut both ways, right? If you're on the eve of trial, the day before trial, introducing a new witness, and this is a very important witness, clearly there's prejudice to the party who is not introducing that testimony. Here, where we're 30 days in advance of trial, witness who is identified on every list had previously been deposed. Everyone had a copy of the deposition. There was no prejudice to the party who had already designated testimony from this deposition. There was extreme prejudice against plaintiff, your honor, because, as I mentioned earlier, in defendant's closing statement, this is at 7960 to 61, the defendants claimed that Dr. Duke had said things to Nicholas Sparks and board member Tracy Lorenzen that her deposition completely contradicted. Dr. Duke testified to playing along with what Mr. Sparks and Ms. Lorenzen were saying. She testified in other parts of her deposition to the fact that Mr. Benjamin was being fired clearly from his job. She mentioned that Mr. Sparks made comments about Mr. Benjamin's mental health, which were not solicited or affirmed by her. And this was, and the absence of her testimony was completely exploited by the defendants. Indeed, in that closing statement, defense counsel said, and I realized Dr. Duke is not here, but she has spoken in this courtroom and proceeded to go through what Mr. Sparks and Ms. Lorenzen testified to and ended with that passage saying, and she may even have to consider moving to where she can get medical care that is for Mr. Benjamin. And that's what she said. So let me ask you, you know, at the hearing, you or whoever was there argued essentially that this rule 26 is fairly limited. You said it really just applied to the testimony a party expects to present by deposition. And the trial judge says she didn't see the base. The trial judge didn't see the basis for that limited principle here. How do you respond to that? Well, well, your honor, the, that, that's, that, that is what we based our understanding on the idea that we did not until Dr. Duke. Well, I mean, in fact, that rule 26, a so limited, if you go in thinking that it is simply for a designation of a witness testimony that you expect to present by deposition. Uh, and so you did not expect to present her testimony by deposition until July the 12th. Well, that's, that's, that's correct. Your honor. Um, you know, and, and we did, you know, we did make an effort to get our designations out there as soon as, as possible. And again, what we're talking about is abuse of discretion. Is that right? That is correct. That is the applicable standard here. And under the situation here, given, you know, when you weigh all of these factors, I mean, the appellate court could see it one way and maybe all of us might've done differently. We would have trial judge, but that's not enough to give you an abuse of discretion. Well, I don't think the Southern states factors, um, your honor, it would be sufficient. Again, I would look to the dowry case where it says that that evidence should not be barred. And under side of a ledger to allow this testimony by Dr. Duke, again, the surprise element was not there. This was a witness who everyone knew was going to testify. How did the judge explain the denial of your request? Yes. Um, so the judge said that, um, he felt that his, his deadline in his order had not been met and that the designations were extremely prejudicial. That's at 66 36. Um, but defendants were not able to proffer at that time, any plausible prejudice here. Again, they had made their designations already. Um, defendants, you know, now in their, in their opposition, you know, tried to claim that, you know, there was uncertainty as to whether, how they would have to prepare for this witness. But obviously if this is a deposition witness, there, there isn't any cross examination to be prepared. The court made final decision on this issue the day before trial, which admittedly does leave, you could leave the parties scrambling, particularly us, your honor, because we had to get on the phone immediately after the conference and make an appeal to Dr. Duke's counsel. She was speaking to us through counsel at that during this time and make an appeal to her to show up in person. That would have prejudiced the parties more than anything, your honor, the sense that now we're going to have a live witness at trial and all the parties would have to prepare for that unexpectedly. Um, you know, so this was the only timeliness related issue or, or anything like that in the lead up to this trial. There's so under surprise, there was no surprise. There was ample ability to cure the surprise. Given the 30 days, there was no, there would have been no disruption to the trial whatsoever. And as it turned out, there wasn't much for the defendant to take advantage of it. Oh, pardon me. You go ahead and finish the thought. Appreciate it. And given the importance of this evidence, the critical nature of this evidence, again, she's in the room. She is making tests. She's giving testimony that contradicts defendants on critical pieces of information here regarding termination and, and the disability discrimination piece and the non-disclosing parties, um, really did have to do with the fact that witness status changes at times. And therefore that is why this met all of the Southern states factors with regard to admission. And yes, um, abuse of discretion, given the importance of the witness and the fact that there's no cognizable prejudice here. And obviously we feel that this was something along with the admission of the vast amount of character and prior act evidence that poisoned the record and requires vacating the jury verdict. Very good. You've saved some rebuttal time. We did. Thank you. Mr. Pinto. Yes, your honor. And if it please the court, Rick Pinto, along with Deborah Bowers, representing the epiphany school of global studies, uh, Mr. Benjamin resigned his position as head of school at epiphany. He signed a resignation letter. He later changed his mind. He sued epiphany and Mr. Sparks. He lost on every issue put before a jury and, uh, won't accept that. And here we are, uh, I'll point out initially that the court in looking at all of the issues before the court, except for the summary judgment and motions to dismiss has to look at the evidence in the light, most favorable to the defendants. There is a mountain of evidence on each issue favorable to the defendants. Also point out before I get into the weeds of my argument, uh, that all of the issues on appeal with the exception of the defamation claim are mute. If, uh, if the court upholds the jury verdict that said that Mr. Benjamin voluntarily resigned because if he voluntarily resigned, there's no adverse employment action. And therefore none of the discrimination claims, nor any of the breach of contract claims, uh, proceed. Uh, that specific question was put to the jury and the interrogatory and the jury found that he resigned. Yes, sir. That was the first, that was the first issue they found not only he resigned, but they found he resigned voluntarily or more to the point. They found that the plaintiff did not prove that his resignation was involuntary. Um, I want to talk for just a minute about this meeting. Specifically what's the verdict? So, uh, yeah, for the formal jury found that the plaintiff failed to, uh, meet, meet their burden of showing that the resignation was involuntary. Okay. Yeah. Um, with regard to the resignation meeting, that meeting took place, uh, at a time after several meetings with Mr. Benjamin, uh, when he knew that his job was on the line because they had been talking to him about all of the issues that you read about in the briefs, uh, and in the record, the meeting was over two hours. His wife was present and they spent that meeting negotiating the terms of a voluntary, uh, split with a set negotiating the terms of a severance package. Uh, the wording of the, uh, resignation, I think is important. You'll find that on page five of our brief, but Mr. Benjamin contends he only wrote what the people told them. Everybody else in that meeting said he voluntarily wrote this out himself. But what he says is I will share with you. There was testimony at trial that no one called Mr. Benjamin CEO, except Mr. Benjamin. He also said, I want to thank my faculty staff and student colleagues. There was evidence that no one, but Mr. Benjamin referred to students as student colleagues. So there was, uh, some information other than just say so that the, uh, resignation was voluntary. Uh, more importantly, after Mr. Benjamin and Ms. Zuak left, uh, Mr. Benjamin wrote Tom Plissick, who was with the placement firm that had placed him in his job. And he told him on that same day, I have offered my resignation as headmaster and CEO, et cetera. He followed that by writing Mr. Sparks, Mr. Gray, and Ms. Lorenzen, an email, uh, saying that he would live by the spirit of the separation agreement. And he was glad that they came to an agreement yesterday. That was satisfactory to all of us, including the $150,000 severance package. And finally, Ms. Zuak the next day, email Mr. Sparks and thanked him for his generosity in the separation agreement and severance package. So there's no question, but that there was a, uh, voluntary resignation. Uh, since we, uh, the court spent some time on Ms. Zuak's deposition testimony, let me share the timeframe because what Mr. Pearson shared with you is not exactly what the record reflects. Everyone knew Ms. Zuak lived in Canada and her deposition had been videotaped videotaped and taken in 2018. In February of 2019, a case management order was entered. And in that case management order, judge Devard said on July one, your rule 26 disclosures are due. Rule 26 disclosures include deposition designations on that date or within a day or two. There was a telephone call or emails shared between Mr. Pearson and the attorney for Ms. Zuak in which that attorney said, I can give you no guarantee that Ms. Zuak will appear for that trial. So he was put on notice in February. There was some other discussion, uh, between them at, at, at that time. And there was an offer on the part of the attorney that said, get back to me. If you want to work these out, Mr. Pearson did not have any further contact until three days before the designations were due on June 27. Um, that day he called and told the lawyer, I need her here for trial in August. The lawyer said to Mr. Pearson, Ms. Zuak prefers not to testify on that date. So before the designation, he was on notice that she was not going to testify on July one, Mr. Pearson does not make a deposition designation as is required on July two. And that was the deadline. July one was the deadline. Yes, ma'am. July one was the deadline set in the case management order on July two. The next day, the lawyer in Canada emails Mr. Pearson and says, confirming our telephone conversation, my client is not inclined to participate voluntarily. So he knew on July two that Ms. Zuak was not going to come down voluntarily. Mr. Benjamin never filed a motion to allow a video testimony, never filed a motion for an expedited hearing on an effort to get their, their end. And he never filed a motion to amend his rule 26 designations. What he did do after the July 12 conversation, when the lawyer confirmed that she's not coming, the parties had been exchanging draft pretrial orders. On July 25, Mr. Pearson sent to defense counsel and updated draft of his pretrial order. With that email, he outlined every change to the prior pretrial order, except he didn't say anything about the deposition designations that he had slipped in as a portion of that latest draft. So that's the timeline on July 31, he comes to the court and he says he wants to use the deposition for defendants of JET. And the court rules under rule 26 under the case management order and under rule 37, importantly, and looking at the southern state standards that he determined that it was the delay was not substantially justified. And he said that all the quotes are in our briefs, but he said, obviously you knew she wasn't going to come. Obviously you knew it would be difficult to have a video conference, some trial, even, and you didn't even make a motion about that or contact defense about that. It is just difficult for the court to believe that you shouldn't have known she wasn't coming and you should have designated them with regard to the do not expect issue. The court just said, I've never heard that before in my 45 years from the time I've practiced and been on the bench. If that was the standard, then nobody would expect it and everybody would be surprised at the end. And Judge Wynn makes an important point in the Bressler case when he says if this testimony is so important to the plaintiffs, then it is even more important to disclose timely that information to the defendants because they need that time to prepare. And as far as our prejudice, remember, we are under a 14 hour deadline. We had spent a lot of time figuring out who was going to say what we have three defendants and two lawyers sharing 14 hours. Well, I am, I'm surprised by both the parties and of course you have to respond so much time is being spent on this issue in this case. Maybe I'm misreading it, but I just did not see this issue that we would spend all this time on, particularly when I understand, I expect the judge still, I think it's enough to support him. I don't know about the obviousness of it when you're dealing with an ex-wife. I'm sure there was a lot of other expectations of what might happen, what could happen. But the end result is when you read this thing, just as technically as it is, it weighs down on all fours on it. But let me ask you just as a matter of practice, because this is really more than exercise in civil procedure. So the thing I, maybe there'd be a bar exam question on what am I in terms of listening. But you know, if a court has already issued a case management order, it has a deadline, what happens if, what can a person do if he then discovers that he, you know, he needs to, to use this deposition testimony instead? I mean, what is the remedy that he has at that point? If he truly discovered it after the fact, which is not the case here, he can move to amend his disclosures, set forth the reasons, and if the court feels it's substantially justified, the court can allow it. And if I can have, I agree Judge Wynn, and if I can have two minutes here and if I go over slightly, Mr. Silver has graciously said I could angle into his time a little bit. I will touch on the two other aspects that I think the court may be interested in. With regard to the after-acquired evidence of the jobs at Verde Valley and Deep Springs, I will say that those were, the court determined that those were relevant to contract defenses, after-acquired evidence. The evidence was that if the Board of Trustees had known about that information, they would not have hired Mr. Benjamin, and if they had learned it after the hire, they would have fired him for cause. The court was very clear that that was the only basis that that information was coming to the jury. They instructed the jury four times that it was being admitted not for its truth, but to show the state of mind of the Board of Trustees if they had known. The standard is whether it was arbitrary or irrational, and this court has indicated that a verdict will not be overturned on those grounds except under the most extraordinary circumstances. I'll point out that Judge Dever did not allow all of that deposition testimony in. Much of what we wanted to have come in for the jury, he excluded, and many of the documents we wanted to have come in for the jury, he excluded. So it was very limited, and he also instructed the jury that opening statements, closing arguments, and questions are not evidence. So any comment about that information was addressed there. And finally, with regard to the breach of contract claim and the jury instruction, I'll briefly point out that this court's pretty clear. You can't just take one line and say that line misrepresents the law. You have to look at the entire charge, and in fact, you have to look at the entire record, and all of the record of this case shows that the evidence points to resignation. The issue number two turns out, in fact, if a jury determined that the resignation was involuntary, the next issue talks all about termination and talks all about the defendant's duty to prove that the termination was for cause. So it's cured if there was an error, which we don't believe there was, but it's cured by the rest of the charge. And the examples from Stone that give examples that if you're faced with two choices and both of them are bad, that still means you have a choice and it's still a voluntary decision, those weren't facts taken from the Benjamin case, those were facts taken from the Stone case. So the charge was taken directly from that case and correctly outlined the law. Thank you, Ron. Thank you, sir. Mr. Silver? May I please the court? I'm Jay Silver. I represent Nicholas Sparks and I represent the Nicholas Sparks Foundation. I will be brief. Judge King, to your question earlier, I just want to be very clear. The verdict form as to the resignation read, did plaintiff Saul Hillel Benjamin prove by preponderance of the evidence that his resignation from defendant, the Epiphany School of Global Studies was involuntary? And to that, the jury answered no. They answered dissimilarly to a similarly worded, almost identically worded answered no with respect to the foundation. Because I represent Mr. Sparks and the foundation, I first want to address points that are specific to each of them. Let me talk about that resignation from the foundation first. Specifically, I disagree with that Mr. Pearson's view that there was a lack of evidence even sufficient to support a resignation instruction with respect to the foundation going to the jury. And no, I do not believe that he adequately preserved that. And his briefing on this issue, it certainly wasn't brief that way in his opening brief. And furthermore, when you look at the record and specifically his own factual contention in the pretrial order states, Mr. Benjamin had no intention of resigning from Epiphany and the foundation and only did so because he was under duress. And similarly, at another point in the pretrial proceedings, he said, Mr. Benjamin must prove by preponderance of the evidence that the cessation of Mr. Benjamin's contracts and employments would not volunteer on the part of Mr. Benjamin. Those are plaintiff's words, not our words. The evidence in this case was that Mr. Sparks walked into the November 21 resignation meeting. He did tell Mr. Benjamin his contract as an independent contractor at the foundation was being terminated for dishonesty. Then Dr. Dulek and Mr. Benjamin negotiated a resignation and severance from the foundation. I mean, excuse me, from the school later that night, Mr. Benjamin. That is his wife, Jenna. Yes, sir. So they negotiate a resignation from the school. He writes an email that night to this recruiter who recruited him to Epiphany. He tells the recruiter, I resigned. He sends an email the next day to Nicholas saying to Mr. Sparks, I've resigned. His wife then, who is also, by the way, a vice president of the foundation, comes to another school board member and another volunteer of the foundation the next day and says, would you agree or would you ask Nicholas Sparks on behalf of the foundation to agree that Mr. Benjamin, that Saul, my husband, be allowed to resign from the foundation? They said yes. And they sent a confirming letter to that effect a few days later, to which Mr. Benjamin never responded. So there is evidence. And the jury found that no, he did resign and that that was more than adequate, I think, to support the jury's verdict. Let me move on for just briefly to talk about the defamation issue and specifically plaintiffs challenged the inadequacy of the instruction and claimed basically that under North Carolina law, you're not permitted, you should be permitted some latitude in what the statement is in a slander case that's submitted to the jury. That's not North Carolina law. That's totally circumvents in a slander or defamation context, the first amendment and slander per quote, if you will, or slander per se requirements that a judge serves as a gatekeeper or before a statement can go to the jury, a judge has to decide, is it a matter of statement of opinion or fact that's required under the first amendment? And secondly, he or she has to decide, and is this a statement that's susceptible of only one meaning so that it's truly slander per se? And if you were to adopt plaintiff's reading, which by the way, again, has no legal support, well, then all you could do is really that you're guessing as to what as a gatekeeper, as what's going to go to the jury. The only case I do side against it for that is a case decided by Judge Britton, North Carolina, but applying Texas law that in which the North Carolina libel claim was dismissed. I then want to close out briefly on this Jenna Dueck issue and just briefly state that no, it was not adequately disclosed. Judge Dever went through this in pain, taking detail and making a finding to exclude her testimony. And as we know, simply designating depositions in this context, we are on a runway to trial. We had to make counter designations. We had to make objections. And at the same time, they sat on this for weeks before they disclosed it and merely flip sheeting it into a without disclosure on July 15th, but not really calling it to our attention. And for several weeks later, that doesn't count. Judge Dever said he'd assume that was in good faith. I don't think it is. But the judge properly excluded that. I thank you. That's all I have to say right now. Thank you, Mr. Silver. Mr. Pearson. Yes, your honor. Thank you. First, very briefly on the defamation point, the North Carolina pattern instructions do not provide quotations in the instruction with regard to defamation. They simply ask, did the defendant slander the plaintiff? The inclusion of the quotations here were extremely problematic because they were not just exact quotations, but they contain compound statements saying, asking whether Mr. Benjamin had proven that Mr. Sparks had said that he, quote, had dementia and and that bipolar disease runs in his family. And the other instruction as well contain compound questions when parts of these statements would be defamation. Mr. Sparks himself testified that he may have talked with the board about Mr. Benjamin suffering from mental health issues. Ms. Lorentzen did the same, said that in discussions with the board, the words dementia and Alzheimer's had been discussed. Plaintiffs are not required to prove a verbatim statement that they allege in their complaint. Plaintiffs are required to prove the elements that Mr. Silver laid out, defamation, that and here that Mr. Sparks made statements regarding Mr. Benjamin's and its relation to his professional competence and ability to hold a job. And Renee Coles testified to classic defamation in her testimony, talking about how Nicholas Sparks told her that Mr. Benjamin, quote, had dementia and bipolar and would probably never work again. And he had to be let go. It had to happen. And that bipolar ran in Mr. Benjamin's family. That's at 74, 48. That is not the exact statement that is in the verdict form, but it is the same. It does match it in substance. The jury heard a few different versions of these statements. Again, Mr. Sparks himself testified that he may have told members of the school community that Mr. Benjamin was acting, quote, unquote, crazy. And, you know, and that's at 70, 21 to 22, but he couldn't recall exactly what he'd said. So, you know, that and along with Ms. Lorenzen's testimony at 73, 51 to 52 and 73, 94 to 96 shows that these statements, again, there was more than enough evidence out there to show that there were defamatory statements made by Mr. Sparks regarding Mr. Benjamin. But to hold the plaintiff to exact quotations, the jury can easily be misled that those precise statements and all of the statements made in those instructions needed to be proven. Now, turning back to the briefly to the duet testimony issue, I would also urge the court to look at the Silicon Knights Epic Games opinion. That's an Eastern District of North Carolina 2012 opinion where an untimely disclosure that was admittedly important to plaintiff's case factors will often favor the plaintiff in allowing admission. Well, was there anything inaccurate in what opposing the manner in which opposing counsel recited the timeline and what happened here? Yes, there are things that I would dispute, Your Honor. First of all, the conversation that I had with Dr. Duke's attorney in late June, they said that she would come to the trial. The day after we make our July 1st submission, they call back and say, they write the email and we've all had opposing counsel who are somewhat more bold and emailed on the phone saying, no, you know what? Sure. She would rather not have to do it if she doesn't have to. And yes, that's not something that we're going to commit to. We had more conversations and our expectation remained that she would come. That's all that rule 26 says at 26A3A sub 2. Designation of witnesses where testimony of the party expects to present that by deposition. Yes. If we knew now what we, you know, then what we know now, obviously we would have done things differently. Our expectation was she is on this side of the ledger. We're dealing here with Mr. Pinto, Mr. Silver and their teams with very experienced trial counsel. They'd already designated testimony by Dr. Duke. The counter designations deadline had passed two days before we made these designations. And again, under Southern States, Darity, Silicon Knights. This can, yes, indeed be a, an abuse of discretion. The red line that was sent, it was sent in red line. This was not put in, you know, some document with saying, okay, great. Everything's terrific. Ready to go. This was a red line submission. And you highlight that there was that there was that change in the deposition submissions. Like you did other, other items in that document. I have not looked back at the covering email. I don't know whether every other change was accounted for in that covering email, but for that one, it was not accounted for. I don't, I don't believe it was. I don't, but it probably, if defense counsel is making that representation, then it probably was not. I will say, I will say that again, this was 30 days before trial. This was a known witness. The deposition testimony was not hugely voluminous and the defendants took full advantage of this at trial, which is exactly why under the case law, when you have important testimony, the factors favor coming in so long as there is no significant disruption at trial and defendants still can't point to any. With regard to the testimony by, by Newell and Salzman at trial, the testimony by previous employers, this is a hugely important point because it really poisoned the entire proceeding. The testimony by those witnesses had a palpable visible effect on the jury and defendants closing statement. This is at 7858 showed that they knew exactly why they were introducing this. This had nothing to do with the after acquired evidence defense. That defense had to do with alleged disputed discrepancies in whether or not Mr. Benjamin had identified an employer from 1990 where he was at six months on his resume, as well as the dates of some of his other employments back in the 1990s. For that, you do not need 239 pages. And that's how much trial testimony was read, um, presented by, by video, uh, deposition at that trial by these two witnesses to establish the dates of employment, because that was the supposed misconduct or misrepresentation that served as the basis for that defense. Instead, what you got was Newell talking about how Mr. Benjamin had supposedly given him a falsified resume back in 1989 or, or, or 1990. And that piece of testimony, I can tell you firsthand had a visible effect on the jury and had nothing to do with limiting instructions on that. Yes. And I'm glad the court brought that up because I wanted to address that as well. Well, I think I heard your bail. I'm not sure. Oh, could we address this one at that point? Yeah, we are. Thank you for the bail too, but you answered the question. Thank you very well. We'll do your honor. The limiting instruction was in fact, and this was in the jury instructions as well, was confusing and futile. The material of course, was in there for the truth of the matter. Otherwise it wouldn't serve as the basis for an after acquired evidence defense, unless the material, unless what you're hearing is true, that this happened at prior employers, which again is not, again, it had nothing to do. This material was about performance and disputes and other things, not about dates of employment. Unless it was true, it wouldn't serve as the basis. State of mind has nothing to do with it. The state of mind of Newell or Salzman, or frankly, the board has no connection to disparaging Mr. Benjamin's performance at employers he was at 20 and 30 years ago. So that part of the instruction was of no avail. Thank you, your honor. Thank you. Thank you very much, Mr. Pearson. We appreciate your arguments and that of the counsel on the other side. This case will be submitted for decision. And Madam clerk, we'll take a brief break and then call the next case.
judges: Robert B. King, James A. Wynn Jr., Stephanie D. Thacker